**Marvin RAINS, Plaintiff,**

v.

**Kenneth APFEL, Commissioner of Social Security, Defendant.**

**No. 99–4018–RDR.**

United States District Court, D. Kansas.

Feb. 21, 2001.

Steven M. Tilton, Tilton & Tilton, LLP, Topeka, KS, for plaintiff.

D. Brad Bailey, Office of U.S. Atty., Topeka, KS, for defendant.

## MEMORANDUM AND ORDER

ROGERS, District Judge.

This is an action to review a final decision by the Commissioner of Social Security regarding plaintiff's entitlement to disability insurance benefits and supplemental security income (SSI) benefits under the Social Security Act. The parties have briefed the relevant issues and the court is now prepared to rule.

### I.

Plaintiff filed applications for disability and SSI benefits on September 22, 1995. He alleged that his disability began on June 30, 1991. Plaintiff indicated that he was disabled due to rheumatoid arthritis and disorders of the back. Plaintiff's applications were denied initially and on reconsideration by the Social Security Administration (SSA). A hearing was ultimately conducted by an administrative law judge (ALJ) on April 16, 1997. On April 25, 1997, the ALJ determined in a written opinion that plaintiff was not entitled to disability or SSI benefits. On December 21, 1998, the Appeals Council of the SSA, after considering additional evidence, denied plaintiff's request for review. Thus, the decision of the ALJ stands as the final decision of the Commissioner.

### II.

This court reviews the Commissioner's decision to determine whether the records contain substantial evidence to support the findings, and to determine

whether the correct legal standards were applied. *Castellano v. Secretary of Health & Human Services,* 26 F.3d 1027, 1028 (10th Cir.1994). Substantial evidence is " 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " *Soliz v. Chater,* 82 F.3d 373, 375 (10th Cir.1996) (quoting *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971)). In reviewing the Commissioner's decision, the court cannot weigh the evidence or substitute our discretion for that of the Commissioner, but we have the duty to carefully consider the entire record and make our determination on the record as a whole. *Dollar v. Bowen,* 821 F.2d 530, 532 (10th Cir.1987).

The Commissioner has established a five-step sequential evaluation process to determine if a claimant is disabled. *Reyes v. Bowen,* 845 F.2d 242, 243 (10th Cir. 1988). If a claimant is determined to be disabled or not disabled at any step, the evaluation process ends there. *Sorenson v. Bowen,* 888 F.2d 706, 710 (10th Cir. 1989). The burden of proof is on the claimant through step four; then it shifts to the Commissioner. *Id.*

### III.

Plaintiff was born on July 18, 1958. He completed the ninth grade and later received a GED. He has received automotive and truck driving training. He has been employed as a paving machine operator, tow truck driver, truck driver, and auto mechanic. He has not engaged in substantial gainful activity since June 30, 1991.

Teryl R. Boothe, D.C., treated plaintiff from May 24, 1990 to August 13, 1990 for severe mid-back pain. Dr. Boothe treated plaintiff with chiropractic adjustments and ultrasound therapy. X-rays showed a mild S-shaped thoracic scoliosis and a mild destro-scoliosis in the lumbar spine. They showed no evidence of recent fracture or gross osteopathology. Dr. Boothe indicated that, during his treatment, he would not have allowed plaintiff to work in any job that required lifting in excess of twenty-five pounds, repetitive bending and/or stooping, and standing or sitting in excess of four hours without a break. He determined that plaintiff could perform work within these guidelines.

On December 21, 1990, plaintiff was seen by Clarence M. Leary, M.D. Plaintiff told Dr. Leary that he had been in his usual health until an automobile accident in 1985. He stated that he began experiencing severe neck problems following the accident. He returned to work, but was unable to continue because his arms, hands and legs began to fall asleep. He further indicated that he had constant headaches and difficulty sleeping. He felt that his condition was worsening, but he was not taking any medication. Dr. Leary found a normal range of motion of the cervical spine in extension and flexion. He noted a fifty percent limitation or rotation to the left and the right. He found tenderness over the slopes of the shoulders on either side and some muscle spasm. Dr. Leary determined that plaintiff had (1) bilateral carpal tunnel syndrome operated on the left; and (2) degenerative disc disease of the cervical spine and mild fascial pain in the left scapular area.

Plaintiff was seen by Ron Whitmer, D.O., following a work accident on June 19, 1991. Plaintiff had hurt his back when he fell from the step of a tow truck. Plaintiff indicated that he had suffered severe pain in his left shoulder since the accident. He also reported some pain in the left leg area. Dr. Whitmer referred plaintiff to Reiff Brown, M.D. and Viswanatha Kharidi, M.D. for further evaluations.

On July 11, 1991, Dr. Kharidi conducted a comprehensive neurological examination

of plaintiff. Plaintiff told Dr. Kharidi that his condition had not improved since the accident. He noted pain in his neck and numbness in his left arm and hand. He also complained of stiffness in his neck and weakness in his left upper extremity. On examination, Dr. Kharidi found tenderness over the paracervical muscles. He noted that neck movements caused discomfort in the neck, radiating to the left shoulder and upper extremity. He found grip strength weaker on plaintiff's left side. Dr. Kharidi concluded as follows:

> The patient appears to have cervical radiculopathy on the left side. It is necessary to rule out the possibility of discogenic radiculopathy. He also has thoracic radiculopathy in the upper thoracic region.

He recommended treatment with a soft cervical collar, anti-inflammatory analgesics and physical therapy with hot packs and ultrasound. He stated that plaintiff should avoid weight lifting, excessive neck movements, and strain of the shoulder and neck.

Dr. Kharidi subsequently performed nerve conduction studies and an MRI scan on plaintiff. These were both normal. The MRI scan showed no evidence of disc degeneration, bulging, herniation, abnormality of the spinal cord or nerve roots.

Plaintiff was seen by Dr. Brown, an orthopedic specialist, on August 27, 1991. Plaintiff complained of continuing pain in the left scapular area, radiating into his left arm, and numbness and occasional swelling in his left hand. Plaintiff had received some physical therapy, but it did not provide substantial relief. On examination, Dr. Brown found some loss of movement of the cervical spine, but no discomfort in the scapular area. He noted tenderness over the left scapula and a markedly increased area of discomfort over the mid-portion of the scapula and a

separate area at the inferior aspect of the left rhomboid muscle area. He determined that plaintiff's range of motion in his left shoulder was normal, although there was pain when plaintiff moved his arms above shoulder level. Dr. Brown indicated that plaintiff's symptoms resembled myofascial pain syndrome with broad expanses of extremely tender muscles. Dr. Brown saw plaintiff again on October 8, 1991, when plaintiff requested an injection and reported some improvement in his symptoms. Plaintiff was exercising, taking long walks, and staying as active as possible. Dr. Brown believed that plaintiff had reached maximum medical improvement. He advised plaintiff to get back to work as soon as possible and opined that plaintiff had a three percent permanent partial impairment of function. He indicated that the additional deconditioning and weakening had occurred due to inactivity and was temporary, and that no permanent work restrictions were necessary.

On November 5, 1991, Dr. Whitmer wrote a letter concerning plaintiff's condition. Dr. Whitmer opined that plaintiff was still disabled as a result of the accident. He noted that plaintiff was having difficulty sleeping and was unable to use his left arm due to the pain. He indicated that plaintiff needed a residual functional capacity evaluation.

Plaintiff saw Milo G. Sloo, M.D. on November 15, 1991. Dr. Sloo, an orthopedic specialist, examined plaintiff and his impression was that plaintiff had chronic myocervical sprain syndrome of the neck and upper back with possible left cervical radiculopathy. Dr. Sloo wanted to conduct some additional studies and recommended that plaintiff not return to work until he released him.

On November 26, 1991, in a progress report, Dr. Whitmer noted that plaintiff

continued to be disabled as a result of back and shoulder pain and opined that plaintiff's temporary disability should not exceed four weeks.

Dr. Sloo saw plaintiff again on December 6, 1991. At that time, he noted that an EMG and a nerve conduction study showed no neurological damage. Dr. Sloo stated that plaintiff should not return to work until he received a work capacity assessment. On December 18, 1991, Dr. Sloo noted that plaintiff informed his attorney that he had seen a doctor in California on December 2, 1991. Since plaintiff saw Dr. Sloo on December 6, 1991, and did not mention this visit, Dr. Sloo stated that he was "highly suspicious" of plaintiff's motives. On January 6, 1992, Dr. Sloo released plaintiff to light work and stated that he had a permanent partial disability of five percent of the body as a whole.

On April 29, 1992, Dr. Sloo again saw plaintiff. Plaintiff told him that he had returned to work full-time but that he had been laid off because the business had closed temporarily. Plaintiff said that his left shoulder and arm had not changed significantly since his last visit. Plaintiff stated that it "hurts like hell" when he lifts twenty pounds. During the examination, Dr. Sloo found that plaintiff was in no acute distress. He noted that plaintiff moved all parts well casually, but he was tender throughout the muscles in the upper rhomboid and supraspinatus areas. Dr. Sloo sought to schedule plaintiff for a reevaluation of his strength capacity.

Plaintiff was evaluated by a physical therapist on May 5, 1992. At that time, the physical therapist noted that plaintiff had minimal complaints of discomfort with any of the cervical active range of motion movements. He further noted that plaintiff was able to lift fifty pounds from waist level to shoulder level and thirty pounds from shoulder level overhead. He also stated that plaintiff had progressed well over the last five months with improvement in strength, range of motion and lifting capacity.

On November 5, 1993, plaintiff went to T. Scott Webb, M.D. complaining of back pain. Dr. Webb diagnosed plaintiff's condition as somatic dysfunction of the thoracic and lumbar spine. Dr. Webb determined that plaintiff had excellent results when he treated him with hot packs and some massage. Over the next few months, plaintiff continued to see Dr. Webb with complaints of back pain. Dr. Webb continued to treat plaintiff with hot packs and massage. These treatments continued to show good results. In May 1994, plaintiff complained of headaches. On June 21, 1994, plaintiff told Dr. Webb that the headaches were not improving.

On August 9, 1994, plaintiff saw Dr. Webb again and reported he was experiencing upper thoracic pain and lower back pain after moving furniture over the weekend. Hot packs were again applied with good results. On September 3, 1994, plaintiff reported that his back pain had worsened after he had done "a lot of lifting and hammering lately." Dr. Webb again provided hot packs and some medication. On December 22, 1994, plaintiff complained of increased burning sensation in his back radiating into both of his legs. On February 16, 1995, plaintiff again made complaints of low back pain and mid-thoracic pain. Dr. Webb noted that plaintiff had stated that the sciatic nerve symptoms go away fully after treatments and do not return for several weeks.

On August 8, 1996, plaintiff again went to Dr. Webb for treatment. He complained of numbness in his legs and frequent migraine headaches. Dr. Webb noted that his findings were suggestive of degenerative disc disease. In October 1996, Dr. Webb noted that plaintiff's migraine head-

aches were much better but his back pain had not improved. Dr. Webb suggested to plaintiff that he get an MRI. Dr. Webb noted: "I think he cannot perform any duties with his low back until he has further evaluation of this problem; he may need to have some job retraining."

In 1997, plaintiff was again examined and treated by Dr. Webb on several occasions. Plaintiff complained primarily of back pain. Dr. Webb determined that plaintiff had rather serious degenerative disc disease.

At the hearing before the ALJ, plaintiff testified that he had not worked since 1991 except for two occasions when he unsuccessfully attempted to resume working. He indicated that he has not been able to work since that time because his arms, legs and feet frequently go to sleep and burn, particularly when he sat for a significant period of time. He also indicated that he experienced migraine headaches on a daily basis. He further stated that he has had back and neck pain since an automobile accident in 1985. Plaintiff testified that he could not afford some of the recommended treatment for his back pain, but he did take what medications he could. He indicated that the medication made him very tired. He stated that working on his knees and moving around aggravated the pain in his back and caused headaches.

When asked about his activities, he indicated that he tried to help out around the house. He said that he washed dishes, did a little laundry, and occasionally cooked dinner. He said that he was unable to run the vacuum cleaner or do other housecleaning. He also said that he did little shopping and no yard activities. He is able to generally take care of himself, but he did need help to get out of the bathtub and had his children help him put his shoes on. He was unable to watch television because he had difficulty sitting for any length of time. He stated that he is able read one book approximately every two weeks unless he suffers a headache. He stated that he used to be involved in many activities, but he had given them up.

Plaintiff testified that he usually goes to bed around 10:00 p.m., and then gets up at 2:00 to 2:30 a.m. because his back is hurting. He then lays down on the living room floor. As a result of his sleeping problems, he frequently takes naps in the afternoon. He stated that he could sit for thirty-five to forty minutes and stand for thirty to forty-five minutes. He could walk about eight blocks, but could not climb a flight of stairs. He said that he was unable to bend or stoop. He stated that he could lift between five and seven pounds at one time. He stated that he was last examined by Dr. Webb in October 1996. He indicated that he has not seen him since because he could not afford any additional treatment.

Cindy A. Younger, a vocational expert, testified in response to a hypothetical question which assumed plaintiff's age, education and work experience. The hypothetical also assumed the following limitations: (1) could lift ten pounds frequently and only twenty pounds occasionally; (2) could engage in moderate bending or stooping; (3) could stand for five to six hours; (4) could only sit for about two hours; and (5) could not engage in continuous or repetitive handling maneuvers. In applying this hypothetical to plaintiff, she responded that such an individual could perform the positions of sales attendant, photographic machine operator, information clerk and security monitor. She noted that such jobs exist in significant numbers in the state and national economies. The ALJ concluded that plaintiff did not suffer from a listed impairment, but that he did have neck and back radiculitis which did constitute a severe impairment.

He found that plaintiff's testimony concerning the severity of his impairments was only partially credible. He concluded that plaintiff retained the residual functional capacity for light work where plaintiff could change positions after two hours sitting, did no more than moderate stooping or bending, and was not required to engage in continuous or frequent handling. He found that plaintiff could not perform his past relevant work, but that he retained the residual functional capacity to meet the demands of a limited range of light work. He determined that plaintiff could perform certain light work which existed in significant numbers on the national economy including sales attendant, photographic machine operator, information clerk, and security monitor. Accordingly, the ALJ determined at step five of the five-step sequential evaluation process that plaintiff had not been disabled since June 30, 1991.

### IV.

Plaintiff contends that the ALJ's decision is not supported by substantial evidence. Plaintiff contends that the ALJ failed to properly assess (1) his allegations of pain; (2) his credibility; and (3) the medical evidence. Plaintiff also argues that the ALJ failed to properly consider all of his impairments, including pain, in evaluating his residual functional capacity.

The arguments made by the plaintiff are all related, but we shall consider them separately. Plaintiff initially argues that the ALJ's decision is not supported by substantial evidence because the ALJ concluded that he is not disabled by pain. Plaintiff suggests that the ALJ failed to properly apply the standards adopted in *Luna v. Bowen*, 834 F.2d 161 (10th Cir. 1987) for evaluating pain.

■ When a claim of disabling pain is made, the ALJ is required to determine (1) whether objective medical evidence establishes a pain-producing impairment; (2) whether a loose nexus exists between the proven impairment and the subjective allegations of pain; and (3) whether, considering all the evidence, plaintiff's pain is in fact disabling. *Luna*, 834 F.2d at 163–64. Because the medical evidence established that plaintiff suffers from back and neck radiculitis, a condition reasonably likely to produce some pain, the ALJ was required to determine whether that pain was disabling by considering all relevant factors.

■ Having carefully reviewed the entirety of the record, the court is persuaded that the ALJ properly followed the analytical track set out in Luna to evaluate pain allegations. He considered the medical evidence, plaintiff's lack of medication, his daily activities, his credibility and his motivation. The ALJ specifically noted the lack of objective medical evidence to support the degree and duration of the pain alleged by plaintiff. He also discounted plaintiff's complaints because his testimony concerning his daily activities did not support a claim that he was unable to engage in all work activity. The ALJ noted that plaintiff helped his children with their homework, washed dishes, cooked, and drove his children back and forth to school. The ALJ's conclusions based on this analysis find ample support in the record. Although it is clear that plaintiff suffers some pain, "[d]isability requires more than mere inability to work without pain. To be disabling, pain must be so severe ... as to preclude any substantial gainful employment." *Gossett v. Bowen*, 862 F.2d 802, 807 (10th Cir.1988) (quotation omitted). The court's role here is to verify whether substantial evidence underlies the ALJ's decision, not to substitute our judgment for his. *Musgrave v. Sullivan*, 966 F.2d 1371, 1374 (10th Cir.1992).

The court also finds that the ALJ properly evaluated the plaintiff's credibility. In evaluating the credibility of a claimant, an ALJ must consider and weigh a number of factors in combination. See *Huston v. Bowen,* 838 F.2d 1125, 1132 & n. 7 (10th Cir.1988). The court recognizes that the ALJ is "optimally positioned to observe and assess witness credibility." *Adams v. Chater,* 93 F.3d 712, 715 (10th Cir.1996) (quotation omitted). Therefore, the court may overturn such a credibility determination only when there is conspicuous absence of credible evidence to support it. See *Trimiar v. Sullivan,* 966 F.2d 1326, 1329 (10th Cir.1992). The court finds that the ALJ's credibility determinations are properly linked to substantial evidence in the record. The record is replete with inconsistencies between the statements made by plaintiff and the medical evidence and record.

The court has undertaken a thorough review of the medical evidence and determines that the ALJ's decision is supported by substantial evidence. Plaintiff has suggested that the ALJ has failed to consider certain evidence and improperly abstracted certain evidence to support his conclusions. We must disagree. The court finds that the ALJ adequately addressed the medical evidence and properly analyzed it. See *Clifton v. Chater,* 79 F.3d 1007, 1009–10 (10th Cir.1996)("The record must demonstrate that the ALJ considered all of the evidence, but an ALJ is not required to discuss every piece of evidence."). We note that no physician suggested that plaintiff was disabled. All of the doctors that examined plaintiff who offered opinions suggested that plaintiff could work with certain limitations. See, e.g., *Talley v. Sullivan,* 908 F.2d 585, 587 (10th Cir. 1990) (claimant's testimony regarding severity of pain must be consistent with medical records); *Potter v. Secretary of Health & Human Services,* 905 F.2d 1346,

1349 (10th Cir.1990) (medical evidence must corroborate claimant's testimony that she was unable to work). The ALJ considered these limitations in determining that plaintiff retained the residual functional capacity to perform some work activity.

In sum, the court finds that the ALJ's decision is supported by substantial evidence. Accordingly, the decision of the ALJ must be affirmed.

**IT IS SO ORDERED.**